HARRISBURG STEEL CORPORA-
TION, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. 5028.

United States District Court
M. D. Pennsylvania.

July 12, 1956.

Hull, Leiby & Metzger, Harrisburg, Pa., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for plaintiff.

J. Julius Levy, U. S. Atty., Scranton, Pa., H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe, Theodore M. Garver, Washington, D. C., for defendant.

FOLLMER, District Judge.

This is an action to recover $50,390.90 paid as excess profits tax and interest for the year 1944. The sole issue is whether a dividend of $53,290 received by the taxpayer from its insurer, Metropolitan Life Insurance Company, accrued as income to the taxpayer in 1946 or 1947.

Jurisdiction is not questioned and the following facts have been stipulated.

At all pertinent times plaintiff kept its books and filed its Federal income and excess profits tax returns on the accrual method of accounting.

On August 19, 1936, plaintiff and Metropolitan Life Insurance Company (hereinafter referred to as "Metropolitan") entered into a contract of insurance designated Group Policy No. 7648–GLH. Thereafter said policy was amended from time to time, but except as specifically noted hereinafter, none of such amendments are material to the present controversy.

On May 7, 1942, plaintiff and Metropolitan entered into a Supplementary Agreement extending the life insurance coverage of Group Policy No. 7648–GLH to cover employees of plaintiff entering into "war service" (as defined therein). Said Supplementary Agreement was attached to and made a part of Group Pol-

icy No. 7648–GLH by simultaneous amendment to the latter.

On November 7, 1945, Group Policy No. 7648–GLH was further amended by deleting therefrom, effective September 30, 1945, the Supplementary Agreement referred to in the preceding paragraph.

On June 25, 1946, Metropolitan's Board of Directors adopted a resolution to the effect that the available balance, if any, as of September 1, 1946, of the special· war risk insurance reserve be returned to the policyholders as soon after September 1, 1946, as practicable.

In a letter to the plaintiff dated January 14, 1947, Metropolitan explained why it was returning $53,290 to the plaintiff and enclosed a check for that amount bearing the same date.

Plaintiff was not advised by Metropolitan of the action taken by its Board. of Directors on June 25, 1946, and had no knowledge of Metropolitan's determination of the amount refundable or of the issuance of the refund check prior to the receipt by the plaintiff after January 14, 1947, ·of the aforesaid check and transmittal letter.· Plaintiff on its books did not accrue the refund of $53,290 as income until after the check and transmittal letter had been received.

Plaintiff included said refund of $53,290 in taxable income in its corporation income tax return for the taxable year 1947 and paid tax thereon. Upon examination of plaintiff's claims for refund of excess profits tax for the taxable year 1944, the Commissioner of Internal Revenue determined that the said refund of $53,290 accrued as income to plaintiff during the taxable year 1946. Accordingly the Commissioner decreased plaintiff's net operating loss for the taxable year 1946 in the amount of $53,290, decreasing the net operating loss carry-back from the taxable year 1946 to the taxable year 1944 and the amount of the net operating loss deduction for the taxable year 1944 accordingly.

On October 15, 1953, plaintiff timely filed with the District Director of Internal Revenue; Philadelphia, Pennsyl· vania, an amended and supplemental claim for refund of corporation excess profits tax for the taxable year 1944 in the amount of $50,390.90. Said claim for refund incorporated by reference plaintiff's prior claims for refund for the taxable year 1944 and complained specifically of the action of the Commissioner of Internal Revenue referred to in the preceding paragraph.

On October 13, 1954, within two years of the commencement of this action, the Commissioner of Internal Revenue notified plaintiff by registered mail of the disallowance in full of said amended and supplemental claim for refund.

Plaintiff timely paid substantial excess profits tax for the year 1944. In the taxable year of 1946 it sustained a net operating loss. Under the provisions of Sections 23(s) and 122 of the Internal Revenue Code of 1939, 26 U.S.C.A. §§ 23 (s), 122, plaintiff was entitled to deduct said loss from its gross income for the taxable year 1944 in computing its corporation income and excess profits tax liability for the taxable year 1944. Plaintiff in due course filed claim for refund which was eventually disallowed in full by the Commissioner of Internal Revenue because the Commissioner had in due course determined that the Metropolitan refund was properly chargeable as 1946 rather than 1947 income.

As above stated, the sole controverted factor in the case is whether certain income, to wit., a rebate or dividend on the insurance policy in question accrued to plaintiff during the taxable year 1946, as the Government asserts, or in the taxable year 1947, the year in which plaintiff received it and reported it as taxable income, as the plaintiff asserts.

The pertinent portion of Group Policy No. 7648–GLH reads as follows:

> *"Section 13.* Participation in Divisible Surplus.—This Policy is a participating contract and the Company shall annually ascertain and ap-

portion any divisible surplus accruing under policies of this class. Any such divisible surplus apportioned to this Policy shall be paid in cash to the Employer or, upon written request from the Employer to the Company, shall be applied to the payment of the aggregate of the premiums next falling due under this Policy. In either event, such divisible surplus is to be distributed or applied by the Employer, according to the respective rights thereto, if any, of the parties contributing to the premiums hereunder."

On June 25, 1946, Metropolitan's Board of Directors took the following action:

## "Distribution To Policyholders of Group Life War Risk Insurance Reserve

"The Chairman explained that extra war risk insurance premiums which had been charged during the War to Group Life policyholders in the United States and Canada to provide Group Life insurance for their employees in military service or otherwise subject to extra hazards due to war action had been discontinued as of August 31, 1945 but that in accordance with the Group Dividend Formulae, the excess of such premiums over expenses and death claims chargeable against such premiums has been held to the credit of these groups as a special war risk insurance reserve. He stated that out of 385 Group policies containing such arrangements only 1 had paid less in premiums than the expenses and death claims chargeable against those premiums and in this case the deficiency was less than $1,000. Since the United States military authorities usually observe a period of one year before declaring 'dead' a person who was missing in action, the Chairman recommended that as of September 1, 1946 there be returned to Group Life policyholders

any remainder of the special war risk insurance reserve then available under their policies, with the following exception * * *

"On Motion It Was Resolved

"That the available balance, if any, of the special war risk contingency reserve as of September 1, 1946, with respect to each Group Life policyholder or former policyholder who had contributed to that reserve, be returned to such policyholder or former policyholder as soon after that date as practicable, * * * ."

Plaintiff, I think, has succinctly stated the procedure followed by Metropolitan by way of implementation of its Board's action as follows:

"Implementation of the above resolution by Metropolitan's Actuarial Division entailed bringing the last annual calculation under each Supplementary Agreement up to September 1, 1946 by crediting any additional premiums earned since the last annual calculation, charging expenses against such premiums under the current year's formula, charging additional claims that had not previously been reported, and determining the remainder as constituting the special dividends payable under the Board resolution. The Actuarial Division was required to await the receipt of certain data before commencing this operation, so that it did not begin to make its calculations until about October 1, 1946.

"In the case of plaintiff, an employee of the Actuarial Division, applying the dividend formula, computed a special dividend in the amount of $53,290. This computation was then reviewed and checked by a Section Head and Assistant Section Head, and on December 18, 1946 these persons certified that a dividend of $53,290 payable to plaintiff could be included in a dividend authorization sheet to be typed. Ac-

cordingly on the same date a dividend authorization sheet was typed on which plaintiff's name and a dividend of $53,290 were typed in along with the names of certain other policyholders and the amounts of the dividends for payment to the latter.

"The elapsed time from approximately October 1, 1946 to December 18, 1946 was a normal period for this operation considering the time of year in which it took place.

"The dividend authorization sheet was then transmitted to an assistant actuary and was approved by the latter. This approval constituted the authorization by the Actuarial Division of the payment to plaintiff of a special dividend in the amount shown on the dividend authorization sheet. The normal elapsed time between the preparation of a dividend authorization sheet and its approval by an assistant actuary was one or two days, but under certain circumstances it might require three or four days.

"After approval by an assistant actuary, the dividend authorization sheet went to Metropolitan's Group Review Section. The functions of Group Review in this connection were several: to verify the name of the policyholder, to look for any special correspondence as to how the policyholder wanted the dividend paid, i. e., by one check or by several, to verify the name and title of the individual to whom the letter of transmittal should be addressed and to check with the Group Accounts Division as to whether the policyholder was current on the payment of premiums. If it was discovered that a policyholder had not paid all of the premiums then due, Group Review would write to the appropriate field representative and ask the latter to remind the policyholder that its premiums had not been paid. Pending receipt of such premium arrearage, Group Review would not pay to the policyholder the special dividend authorized by the Actuarial Division.

"In the instant case Group Review, on January 13, 1947, prepared a check requisition form on which appeared the name of plaintiff and eleven other Group policyholders and the amount of the required check payable to each. Of the twelve policyholders listed on this sheet, eight (including plaintiff) were among the names appearing on the dividend authorization sheet on which the dividend to plaintiff was included.

"The unit within the Group Review Section which performed the above functions was charged with the processing of dividends on approximately 5,000 group policies. The processing of the special dividends in question was neither delayed nor given special priority, but was simply taken in turn. The time interval between the date on which Group Review received the dividend authorization sheet from the Actuarial Division and January 13, 1947, when it requisitioned the check, was normal for the time of year in question.

"Under date of January 14, 1947, Metropolitan transmitted to plaintiff a check bearing that date in the amount of $53,290. The letter of transmittal accompanying said check, addressed to plaintiff's President and signed by Fred Bradley, at that time Manager of Group Review, read in material part as follows:

" 'As you know, your Group Life insurance policy provided for the continuance of insurance on certain employees who entered military service. The premium and claim experience on those employees in military service has been kept separately from the experience of the balance of your group.

" 'We are pleased to inform you that we are now in a position to return the available reserve which has

been withheld on account of the war risk insurance. This reserve amounts to $53,290, the check for which is attached hereto.' "

The controlling statutory provisions are contained in portions of Sections 41 and 42 of the Internal Revenue Code of 1939, 26 U.S.C.A. §§ 41, 42. These provisions are as follows:

"§ 41. General rule

"The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer;
* * *

"§ 42. Period in which items of gross income included

"The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period. * * *"

It seems clear that on June 25, 1946, as the result of corporate action of Metropolitan's Board of Directors, Metropolitan was saddled with a liability to pay plaintiff and by the same token plaintiff acquired a right to receive from Metropolitan. Following a series of implementing procedures by Metropolitan's Actuarial Division, by December 22, 1946, the exact amount of the rebate or dividend was determined. At that point, so far as Metropolitan was concerned there remained only the functions of its Group Review Section and its Check Writing Department.

As to the functions of the Group Review Section, Fred Bradley, an Assistant Manager in Metropolitan's Group Underwriting Division, a witness called by plaintiff, testified as follows:

"A Our function was to separate the authorization from the Group Actuarial Division, to call for the files, for a number of reasons, to verify the name of the group, for instance—oftentimes they change and the Actuarial Division hasn't been notified, but we have means of checking it.

"We look through the files for any special correspondence as to how the policyholder wants his dividend paid. Sometimes they want it broken up in two or three checks, sometimes they would like only one check. We check the name of the person to whom our letters should be addressed, as to spelling and title, make sure that the person we sent it to last year is still on the job. We go to our Group Accounts Division and check on the premium. It is not customary to pay a dividend until the premium for the full policy year has been paid. It is our function to check that. Following that we prepare a requisition to our checkwriter for the drawing of checks."

The functions performed by this section in January 1947 were certainly purely ministerial and had nothing to do either with the fixing or the confirming of a liability in favor of the corporation against Metropolitan. In January the corporation well knew whether it was indebted to Metropolitan for any unpaid premiums and even if it were so indebted, it would involve nothing more than a mere bookkeeping entry, the gross amount of the rebate or dividend would still be reportable.

█ The corporation elected to keep its books and records on an accrual basis. It contends that it "had no knowledge whatsoever, prior to January 14, 1947, of Metropolitan's intention to pay a special dividend nor of the amount thereof." I do not feel that knowledge is a necessary ingredient in the ascertainment of the time of income accrual for tax purposes. Neither plaintiff nor defendant has furnished the Court with any authority directly in point, nor has our independent search disclosed such authority.

Had the corporation become aware of an allowable credit after the end of the

taxable year, it certainly would have sought leave to file an amended return, and leave to so file would undoubtedly have been granted.[1] Surely then the converse must be true.

Mertons' Law of Federal Income Taxation, Vol. 2, Section 12.60, states:

" * * * It is essential to recall, and keep in mind what has been previously said, that it is the *right* to receive and not the *actual* receipt that determines the inclusion of the amount in gross income and that primarily distinguishes the accrual basis from the cash basis. When the right to receive an amount becomes fixed the income accrues. Income does not accrue to a taxpayer until there arises in him a fixed and unconditional right to receive the 'amount even though actual payment is to be deferred. * * * When an item accrues is largely a question of fact to be determined in each case. As is true of other factual questions the burden of proof is on the taxpayer to establish that the Commissioner is wrong in his determination of when an item accrued. * * * "

In Patrick McGuirl, Inc., v. Commissioner of Internal Revenue, 2 Cir., 74 F. 2d 729, 730, certiorari denied 295 U.S. 748, 55 S.Ct. 827, 79 L.Ed. 1693, the court said:

" * * * As a general proposition, where the right to receive money is certain, namely, the liability to pay is unconditional, and books are kept on an accrual basis, the money actually received is considered income as of the year the right to receive it arose and not as of the year when received, even though the amount to be received is not certain as of the year the right to the money accrued. * * * "

It is my conclusion that the special dividend of $53,290 received by plaintiff from Metropolitan was income that accrued during the year 1946. Accordingly, judgment will be entered for defendant.

---

1. Continental Tie & Lumber Co. v. United States, 286 U.S. 290, 298, 299, 52 S.Ct. 529, 76 L.Ed. 1111.